# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JASON E. MIZE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 3:11-cv-685** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **INNOCENTES SATOR, and CORIZON** | ) | |
| **HEALTH, a/k/a CORRECTIONAL** | ) | |
| **MEDICAL SERVICES, in their individual** | ) | |
| **and official capacities;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Pending before the court is a Motion for Summary Judgment filed by the defendants (Docket No. 249), to which the plaintiff has filed a Response (Docket No. 264) and – with leave of the court – a Supplemental Response (Docket No. 337), the defendants have filed two Replies (Docket Nos. 274, 352), and the plaintiff has filed a Sur-Reply (Docket No. 361). Also pending before the court are objections made by the defendants to certain documents filed by Mr. Mize in opposition to the pending motion, including an Objection to the Plaintiff's Statement of Facts (Docket No. 353) and an Objection to the Plaintiff's Expert Witness Disclosure (Docket No. 355), to which the plaintiff has filed Responses in Opposition (Docket Nos. 358, 359). For the following reasons, the Objection to the Plaintiff's Statement of Facts will be overruled, the Objection to the Plaintiff's Expert Witness will be overruled in part and sustained in part, and the Motion for Summary Judgment will be denied. The court will also re-open discovery to allow the parties further opportunity to develop the factual record regarding (1) the role played by Corizon Health, a/k/a Correctional Medical Services ("Corizon") in the delay or denial of

medical care to Mr. Mize, and (2) the expert opinion submitted by Mr. Mize in opposition to the defendants' motion.

## BACKGROUND AND PROCEDURAL HISTORY

This case arises out of the medical care that the plaintiff, Jason E. Mize, received from one of the defendants, Dr. Innocentes Sator, while he was incarcerated at Riverbend Maximum Security Institute ("Riverbend") from 2007 to 2011. Mr. Mize was diagnosed with a chronic hepatitis C infection in 1998 and faced a substantial risk of developing serious damage to his liver, including cirrhosis, as a result. In January of 2011, after multiple years under the care of Dr. Sator, Mr. Mize was diagnosed with "grade 4, stage IV" cirrhosis of the liver. (Docket No. 341 (Ex. 15), p. 91.)[1] Mr. Mize alleges that he would never have developed cirrhosis, or sustained worsening damage to his liver, if Dr. Sator had not repeatedly and consistently refused to prescribe antiviral therapy to treat Mr. Mize's hepatitis C or to undertake the steps necessary to determine the advisability of such treatment. (Docket No. 165 ¶¶ 8–9, 23–68.)

Proceeding *pro se*, Mr. Mize filed this action on August 15, 2011, alleging that Dr. Sator had been deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights, for which he brought a claim pursuant to 42 U.S.C. § 1983. (Docket No. 1 ¶¶ 30–32.) On July 26, 2012, Mr. Mize filed an Amended Complaint with leave of the court, adding Corizon as a defendant. (Docket No. 165.) Mr. Mize alleges that Corizon failed to update a medical evaluation form used by Dr. Sator in determining whether to prescribe antiviral therapy to Mr. Mize, which referenced an outdated version of the Federal Bureau of Prisons' Clinical Practice Guidelines ("FBOP Guidelines") for the treatment of hepatitis C and

---

[1] Docket Number 341 contains a number of exhibits filed under seal by Mr. Mize, and all citations to specific pages of that record reference the page number in the document as a whole, not in individual exhibits.

contributed to Dr. Sator's failure to provide Mr. Mize with adequate treatment for that disease. (*Id.* ¶¶ 10–23.)  Mr. Mize alleges that Corizon did not follow, or does not have, a policy that ensures that updates to the FBOP Guidelines are incorporated into the company's medical evaluation forms and that this failure constitutes deliberate indifference to the serious medical needs of inmates, in violation of their Eighth Amendment rights.  (*Id.*)

On March 4, 2013, the defendants filed a Motion for Summary Judgment (Docket No. 249), accompanied by a Memorandum (Docket No. 250), a Statement of Undisputed Material Facts (Docket No. 251), and the Declaration of Dr. Sator (Docket No. 250-7).  The defendants argue that the court should dismiss all of Mr. Mize's claims because (1) the one-year statute of limitations for § 1983 claims bars Mr. Mize's claim against Corizon and any portion of his claim against Dr. Sator that it is based on events occurring prior to 2010; and (2) Mr. Mize cannot demonstrate genuine disputes of material fact supporting his deliberate indifference claims against Dr. Sator and Corizon.  (Docket No. 250, pp. 6–13.)  Specifically, the defendants argue that Mr. Mize's disagreements with Dr. Sator's medical decisions do not give rise to a constitutional claim and that he cannot demonstrate that Dr. Sator knew of a substantial risk of harm to Mr. Mize that he disregarded when he failed to prescribe antiviral therapy.  (*Id.* at pp. 8–13.)

On April 3, 2013, Mr. Mize – still proceeding *pro se* – filed a Response in Opposition to the motion (Docket No. 263), accompanied by a Memorandum (Docket No. 264), a Response to the Statement of Undisputed Material Facts (Docket No. 267), and various exhibits, which were filed under seal (Docket Nos. 266, 270).  In his Response, Mr. Mize argues that none of his claims are barred by § 1983's one-year statute of limitations because he was not made aware of his injury until he was diagnosed with cirrhosis in January of 2011, a mere seven months before

he filed the Complaint. (Docket No. 264, pp. 1–2.) Mr. Mize also argues that genuine disputes of fact exist that support his claims against both defendants and, when those facts are viewed in the light most favorable to him, a jury could infer that (1) Dr. Sator recognized, and disregarded, a serious risk to his health, and (2) Corizon had a policy of not updating its forms to reflect changes to FBOP Guidelines, in deliberate indifference to inmates' serious medical needs. (*Id.* at pp. 6–34.)

On April 18, 2013, the defendants filed a Reply in support of the motion, in which they primarily argued that Mr. Mize could not establish that either Dr. Sator or Corizon caused him any injury "because he does not have expert testimony" to support such an inference. (Docket No. 274, p. 1.) On August 13, 2015, in response to Mr. Mize's request for the appointment of counsel, the court noted the difficulties Mr. Mize faced in responding to the pending motion because – as a *pro se*, incarcerated litigant – "he has no way to obtain an expert without the appointment of counsel." (Docket No. 324.)[2] After acknowledging that the appointment of counsel in a civil case is not a constitutional right but, rather, justified only by exceptional circumstances, the court found that "the potential merit of [Mr. Mize's] claims and his inability to procure the services of an expert while he is incarcerated" warranted such an appointment. (*Id.*) Newly appointed counsel was given 60 days to file a supplemental response to the defendants' Motion for Summary Judgment. (*Id.*)

On February 9, 2016, Mr. Mize – now represented by counsel – filed a Supplemental Response in Opposition to the motion (Docket No. 337), accompanied by a Response to the

---

[2] Mr. Mize had requested the appointment of counsel once before (Docket No. 184), but he failed to argue that his status as a *pro se*, incarcerated litigant made it impossible to obtain competent expert testimony until *after* Magistrate Judge Griffin had already denied the motion (Docket Nos. 208, 224).

Statement of Undisputed Material Facts and Statement of Additional Facts (Docket No. 338) and

multiple exhibits, some of which were filed under seal (Docket Nos. 339, 341).  Mr. Mize also

filed the Declaration of Dr. Richard B. Martin (Docket No. 339-1) and Dr. Martin's expert report

(Docket No. 339-2), opining that Dr. Sator's failure to provide necessary evaluation and

treatment to Mr. Mize from May of 2007 to May 2009, and again after September of 2010,

"demonstrated deliberate indifference to Mr. Mize's serious medical needs" that prevented

Mr. Mize from receiving potentially life-saving treatment (Docket No. 339-1 ¶ 6).  In the

Memorandum, Mr. Mize identifies evidence that he argues (1) supports the inference that

Dr. Sator perceived, and disregarded, a substantial risk of serious medical harm to him on six

different occasions and (2) establishes a genuine issue of fact with respect to whether Dr. Sator's

conduct caused him to develop cirrhosis and suffer from further damage to his liver.  (Docket

No. 337, pp. 2, 16–23.)  Mr. Mize further argues that, based on the fact that Dr. Sator was using

an outdated medical evaluation form in 2010, "[a] reasonable juror could . . . conclude that

Corizon's practices and procedures were inadequate to ensure that these forms used to treat

patients' potentially fatal conditions were based on current medical science, available treatments,

and up-to-date treatment protocols."  (*Id.* at p. 24.)

On May 25, 2016, the defendants filed a second Reply (Docket No. 352), responding to

Mr. Mize's Supplemental Response and accompanied by a second declaration by Dr. Sator

(Docket No. 352-1).  In this Reply, the defendants argue that none of Mr. Mize's evidence,

including the opinion from Dr. Martin, demonstrates that Dr. Sator was deliberately indifferent to

Mr. Mize's serious medical needs.  (Docket No. 352.)  The defendants further argue that the

specific instances of alleged deliberate indifference identified by Mr. Mize support, at most, a

claim for mere medical negligence and do not rise to the level of constitutional violations that

would support a § 1983 claim.  (*Id.* at pp. 1, 3–4.)  The defendants also filed an Objection to the Plaintiff's Statement of Facts (Docket No. 353) and an Objection to the Plaintiff's Expert Witness Disclosure (Docket No. 355), to which Mr. Mize responded on June 8, 2016 (Docket Nos. 356, 358.)

On August 2, 2016 – with leave of court – Mr. Mize filed a Sur-Reply, in which he argues that Dr. Martin's expert opinion and the evidence that Dr. Sator repeatedly chose not to provide Mr. Mize with courses of treatment prescribed by FBOP Guidelines provide a sufficient factual basis from which a reasonable juror could conclude that Dr. Sator was deliberately indifferent to Mr. Mize's serious medical issues and, through that indifference, caused Mr. Mize serious harm.  (Docket No. 361, pp. 1–7.)  Mr. Mize argues that statements made in Dr. Sator's second declaration regarding a provider's meeting – in which the doctor was purportedly instructed, incorrectly, that FBOP Guidelines recommended no antiviral treatment for a patient with stage IV cirrhosis – further support a finding that Corizon had a pattern, policy, or practice of failing to ensure that updates to the FBOP Guidelines were incorporated into the company's guidance to physicians responsible for the treatment of inmates at prisons in Tennessee.  (*Id.* at pp. 7–8 (citing Docket No. 352-1 ¶ 33).)

**OBJECTIONS**

Before the court can describe the undisputed facts of this case, or those that must be viewed in the light most favorable to Mr. Mize as the non-movant, it must first address the objections made by the defendants to certain documents filed by Mr. Mize in opposition to the pending motion.

**I.**   **Objection to the Plaintiff's Local Rule 56.01(c) Statement of Facts**

The defendants object to the portion of Mr. Mize's Response to their Statement of

Undisputed Material Facts in which Mr. Mize asserts additional facts in support of his opposition to the defendants' Motion for Summary Judgment. (Docket No. 353.) The defendants acknowledge that, pursuant to Local Rule 56.01(c), Mr. Mize is entitled to submit "a concise statement of [any] additional facts that [he] contends are material and as to which [he] contends there exists a genuine issue to be tried" in response to a motion for summary judgment. (*Id.*) They argue, however, that Mr. Mize's facts "appear to be his own statement of undisputed material facts," which they submit is not permitted by any rule, local or otherwise. (*Id.*) The court does not, however, find Mr. Mize's response to be substantially different from any other statement of additional facts typically submitted by a non-moving party in the course of briefing on a motion for summary judgment. Mr. Mize asserts additional facts, supported by citations to the record, and the defendants are given the opportunity to dispute those facts, which they took. The court will, therefore, overrule the defendants' objection to Mr. Mize's additional facts.

In his Response to the defendants' objection (Docket No. 358), Mr. Mize argues that the defendants themselves have violated Local Rule 56.01(c), which requires a party responding to a statement of fact at summary judgment to "demonstrate[] that the fact is disputed" by "specific citation to the record." According to Mr. Mize, the defendants' response is deficient because it "purport[s] to dispute a host of facts asserted by Mr. Mize without providing a specific citation to the record." (*Id.* (citing Docket No. 356 ¶¶ 27, 29, 54, 59, 60 as examples of the defendants' insufficient responses).) Mr. Mize further argues that, because the defendants have failed to sufficiently respond to certain facts, those facts should be deemed admitted for the purposes of summary judgment. (*Id.*) Based on its review of the defendants' responses, the court notes that the defendants *did* fail to adequately dispute some of the additional material facts that were asserted by Mr. Mize and supported by him with adequate citations to the record. Accordingly,

the court will take these failures into account in its discussion of the facts supporting Mr. Mize's claims below.

## II.   Objection to the Plaintiff's Expert Witness Disclosure

The defendants also object to testimony provided by the Mr. Mize's expert, Dr. Martin, in opposition to the Motion for Summary Judgment.  (Docket No. 355.)  The defendants request that the court exclude Dr. Martin's testimony from its consideration of the motion, arguing that they have been prejudiced by the late disclosure of Dr. Martin as an expert and that Dr. Martin's testimony "invades the province of the jury."  (*Id.* at p. 2.)

With respect to the timeliness of the disclosure, the defendants argue that Mr. Mize did not disclose Dr. Martin as an expert until he filed his Supplemental Response in February of 2016, approximately three years after discovery had closed and the pending motion had been filed.  (*Id.* at pp. 2–3.)  The court does not find, however, that the defendants were unduly prejudiced by this late disclosure.  In August of 2015, the court appointed counsel to represent Mr. Mize because of "the potential merit of [his] claims *and his inability to procure the services of an expert* while he is incarcerated."  (Docket No. 324 (emphasis added).)  The court clearly contemplated that, when Mr. Mize supplemented his opposition to the defendants' motion, he would include expert testimony that supported his claims but which he had been unable to obtain while incarcerated.  The defendants were, therefore, on notice that Mr. Mize would likely submit expert testimony, and the prejudice done to them by Mr. Mize's late disclosure was not substantial.  Furthermore, to the extent that the defendants claim that they have been prejudiced by their inability to conduct discovery into Dr. Martin and his expert opinion after the close of discovery, the appropriate remedy is a re-opening of discovery and not the exclusion of Dr. Martin's report from the court's consideration.  Accordingly, the court will order the re-

opening of discovery to allow the defendants that opportunity.

The defendants also argue that Dr. Martin's testimony should be excluded because he testifies to a legal conclusion; namely, that Dr. Sator was "deliberately indifferent" to Mr. Mize's serious medical needs. (Docket No. 355, p. 3.) The defendants are correct in noting that Dr. Martin impermissibly invades the province of the jury when he opines that Dr. Sator was "deliberately indifferent" to Mr. Mize's serious medical needs, as that is the ultimate legal question that must be answered before Dr. Sator may be found liable for violating Mr. Mize's constitutional rights. The court, therefore, will sustain the defendants' objection to the extent that it seeks to exclude any of Dr. Martin's opinions that impermissibly invade the province of the jury, and it will exclude those opinions from its consideration of the pending motion.

## **FACTS**[3]

Mr. Mize was incarcerated at Riverbend from May of 2007 to May of 2009, and again beginning in September of 2010.[4] Mr. Mize was diagnosed with hepatitis C in 1998, and he suffered from a chronic hepatitis C infection (genotype 1) both before and during his incarceration at Riverbend. Hepatitis C is a virus that is transmitted primarily by direct

---

[3] Unless otherwise noted, the facts recounted in this section are drawn primarily from (1) the defendants' Statement of Undisputed Material Facts (Docket No. 251) and Mr. Mize's responses thereto (Docket Nos. 267, 338), and (2) Mr. Mize's Statement of Material Facts (Docket No. 338) and the defendants' response thereto (Docket No. 356). This section also contains facts from the defendants' Motion for Summary Judgment and Memorandum in support thereof (Docket Nos. 249, 250), Mr. Mize's Response and Supplemental Response in opposition (Docket Nos. 264, 337), the defendants' Replies (Docket Nos. 274, 352), and Mr. Mize's Sur-Reply (Docket No. 361) that are not refuted or contradicted by the opposing party or the record. Where there is a genuine dispute of fact, the court will construe the fact in the light most favorable to the plaintiff as the non-moving party.

[4] From May of 2009 to September of 2010, Mr. Mize was housed at the Grayson County Detention Center. No person or entity related to the detention center has been named as a defendant in this action.

percutaneous exposure to infected blood (Docket No. 339-4 (2009 FBOP Guidelines), p. 1), and the parties agree that patients living with a chronic hepatitis C infection face a substantial risk of developing serious liver damage, including fibrosis and cirrhosis of the liver (Docket No. 356 ¶ 21). Cirrhosis of the liver is a painful and life-threatening condition accompanied by a substantially elevated risk of liver failure, liver cancer, and other serious complications. Both parties further agree that a hepatitis C infection can be treated and cured through a combination of pegylated interferon and ribavirin ("interferon/ribavirin treatment"), an antiviral therapy that can also protect a patient from damage to his/her liver caused by a hepatitis C infection. (*Id.* ¶ 12.)

## I.   The Medical Treatment Provided to Mr. Mize by Dr. Sator

Dr. Sator began treating Mr. Mize on May 31, 2007. Based on Mr. Mize's medical records, Dr. Sator was aware that Mr. Mize had been diagnosed with hepatitis C in 1998 and still suffered from a chronic hepatitis C infection. Dr. Sator has admitted that he was further aware that, as a patient who had been living with chronic hepatitis C for nearly a decade, Mr. Mize stood a substantial, ongoing risk of developing fibrosis and cirrhosis of the liver, as well as other serious and potentially fatal liver ailments. (Docket No. 356 ¶ 21.) In addition to his chronic hepatitis C infection, Mr. Mize exhibited multiple risk factors for developing liver damage, including that he was male and that his medical records demonstrated a nearly decade-long history of elevated levels of Alanine Aminotransferase ("ALT"), an enzyme found primarily in the liver.[5]

---

[5] The defendants attempt to dispute this fact by arguing that Mr. Mize's historic ALT levels did not indicate that he was "in immediate danger." (Docket No. 356 ¶ 22.) Whether or not Mr. Mize was in *immediate* danger, however, does not effectively dispute the fact that Mr. Mize's lab results from 1997 to 2007 show that he had ALT levels that were consistently above the upper limit of the "normal" range (Docket No. 341 (Ex. 8), pp. 9–43), or that a history

## A. Medical Care from 2007 to 2009

Mr. Mize's allegations regarding the medical care that he received from Dr. Sator from 2007 to 2009 focus on Dr. Sator's failure to order a biopsy of Mr. Mize's liver, which the parties agree is an essential and necessary step in determining whether an inmate with hepatitis C should be prescribed interferon/ribavirin treatment. (Docket No. 356 ¶ 14 ("To determine whether interferon/ribavirin treatment should be prescribed, physicians must conduct a liver biopsy to "stage" a patient's liver, which generally means to determine the degree of fibrosis or cirrhosis, if any.").) As Dr. Sator has admitted, there was no way for him to determine the stage of fibrosis or cirrhosis present in Mr. Mize's liver without having a liver biopsy performed (*id.* ¶ 25 (quoting Docket No. 119 ¶ 15)), and he acknowledges that he would have had to "stage" Mr. Mize's liver before he could apply FBOP Guidelines concerning the treatment of Mr. Mize's hepatitis, including those regarding the prescription of antiviral therapy (*id.* ¶ 26 (quoting Docket No. 119 ¶ 15).) Dr. Sator did not, however, order that Mr. Mize's liver be biopsied at any point between May of 2007 and September of 2009, when Mr. Mize was transferred to another detention center, nor did he prescribe interferon/ribavirin treatment for Mr. Mize's hepatitis C during that time.

Dr. Sator adopted a Medical Treatment Plan for Mr. Mize's care, in which – rather than having Mr. Mize's liver biopsied to determine whether antiviral therapy was advisable – Dr. Sator instructed Riverbend medical staff to perform regular blood tests on Mr. Mize and monitor his ALT levels.[6] As stated in the Medical Treatment Plan, Dr. Sator planned to order a

---

of elevated ALT levels could be a "risk factor" for liver damage in patients already suffering from a chronic hepatitis C infection (Docket No. 339-2, pp. 1–2).

[6] Dr. Sator affirmed an identical or substantially similar Medical Treatment Plan in December of 2007, June of 2008, and March of 2009. (Docket No. 341 (Ex. 7), pp. 5–7.)

liver biopsy for Mr. Mize only if his average ALT level exceeded two times the high end of the normal range for that enzyme or if two successive laboratory tests showed ALT levels exceeding two times the upper limit of that range (55 units).  (Docket No. 341 (Ex. 7), pp. 5–7; *id.* (Ex. 8), pp. 33–41 (laboratory reports stating that the "normal" range for ALT levels is 0 to 55 units).)[7] Mr. Mize's blood was drawn on five different occasions from 2007 to 2009, and each of the laboratory reports conducted on those samples showed ALT levels above the "normal" range, as follows:

- A June 22, 2007 report shows an ALT level of 63, which has been recorded in the column for "abnormal" results and marked with an "H."  (*Id.* at pp. 33–35.)

- A September 28, 2007 report shows an ALT level of 69, which has been recorded in the column for "abnormal" results and marked with an "H."  (*Id.* at p. 36.)

- A December 22, 2007 report shows an ALT level of 136, which has been recorded in the column for "abnormal" results and marked with an "H."  (*Id.* at p. 37.)

- A May 29, 2008 report shows an ALT level of 87, which has been marked with an "H." (*Id.* at pp. 38–39.)

- A February 17, 2009 report shows an ALT level of 65, which has been marked with an "H."  (*Id.* at pp. 40–41.)

In spite of these elevated levels, and in spite of his own knowledge that he could not determine whether interferon/ribavirin treatment was appropriate without knowing the degree of fibrosis or cirrhosis in Mr. Mize's liver (if any), Dr. Sator did not order a liver biopsy.  Rather, Dr. Sator ordered an ultrasound test of Mr. Mize's liver on September 2, 2008, despite the fact

---

[7] Mr. Mize asserts that the "normal" range for ALT levels is 10 to 40 units, but this assertion is based only on Dr. Martin's description of the "generally accepted range" for ALT levels.  (Docket No. 338 ¶ 37 (citing Docket No. 339-2, p. 2).)  Nothing in the record, however, demonstrates that Dr. Sator was aware, or even should have been aware, that the "normal" range for ALT levels was this low.  On the contrary, the 2005 FBOP Guidelines provide no accepted range for ALT levels, and the laboratory reports actually issued as a result of the tests performed on Mr. Mize's blood samples from 2007 to 2009 state that the normal range of ALT levels encompasses everything up to a result of 55 units.  (Docket No. 341 (Ex. 8), pp. 25–33.)

that contemporaneous FBOP Guidelines only recommended this test for those inmates with hepatitis C who already had cirrhosis or a family history of hepatocellular carcinoma. (Docket No. 339-3 (2005 FBOP Guidelines), p. 10.) At the time that Dr. Sator ordered this test, Mr. Mize's medical records contained no indication that Mr. Mize had cirrhosis or any family history of hepatocellular carcinoma. The parties do not discuss the results of this ultrasound test, but it does not appear that any aspect of Mr. Mize's care was changed after the test was performed. On May 11, 2009, Mr. Mize was transferred out of Riverbend and was, therefore, no longer under the care of Dr. Sator.

### B.    Medical Care from 2010 to 2011

When Mr. Mize returned to Riverbend on September 28, 2010, he was again placed under the care of Dr. Sator. Soon thereafter, Mr. Mize's blood was drawn and sent in for testing, and an October 28, 2010 laboratory report showed that Mr. Mize's ALT level was elevated, as it had been in all tests conducted from 2007 and 2009. (Docket No. 341 (Ex. 8), pp. 42–44 (showing an ALT level of 65 and noting that the upper limit of the "normal" range has been decreased to 40 units).) On October 29, 2010, Dr. Sator ordered another ultrasound of Mr. Mize's liver, which revealed two hyperechoic masses and heterogeneity of the liver, signs that Mr. Mize had suffered damage to his liver. On November 23, 2010, Dr. Sator requested a liver biopsy for Mr. Mize to determine the grade and stage of his hepatitis,[8] a request that was

---

[8] Mr. Mize admits that Dr. Sator requested a biopsy in 2010, but he disputes that the purpose of the biopsy was to "determine the grade and stage of [his] hepatitis" because "no evidence other than Dr. Sator's self-serving declaration" indicates that the purpose of the biopsy was to make such a determination. (Docket No. 338 ¶ L.) Mr. Mize further disputes Dr. Sator's asserted purpose in requesting the biopsy "based on Dr. Sator's complete failure to attempt to stage [his] liver in the 2007 to 2009 timeframe." (*Id.*) Dr. Sator's failure to stage Mr. Mize's liver with a biopsy two years earlier does not, however, have much relevance to the doctor's reasons for ordering a biopsy almost two years later. Furthermore, the fact that Dr. Sator's

approved by the regional medical director.

There is also evidence in the record that, as of November 23, 2010, Dr. Sator was contemplating the prescription of interferon/ribavirin treatment to treat Mr. Mize's hepatitis C. For example, on November 23, Mr. Mize signed a form providing his "Informed Consent for the Intervention of Hepatitis C with Interferon and Ribavirin Therapy," though the form has not been additionally signed by Dr. Sator as Mr. Mize's treating physician. (*Id.* (Ex. 13), p. 81.) Also on November 23, Dr. Sator completed a form published by Corizon entitled "Hepatitis C Medical Evaluation Form" (the "Corizon Form"), which appears to provide guidance to treating physicians on potential contraindications for the prescription of interferon/ribavirin treatment. (*Id.* (Ex. 11), pp. 76–77.) As of 2010, the Corizon Form was clearly outdated, bearing a copyright date of 2004 and referencing FBOP Guidelines from 2003, not the updated versions published in 2005 and 2009. (*Id.*) As reflected on the Corizon Form that was completed by Dr. Sator, Mr. Mize evidenced only two contraindications for interferon/ribavirin treatment, and neither of the marked contraindications was classified as "potentially severe." (*Id.*) Dr. Sator never, however, prescribed interferon/ribavirin treatment to Mr. Mize, and it is ultimately unclear what role – if any – the Corizon Form played in his ultimate failure to prescribe that treatment.

Mr. Mize's liver biopsy was performed on December 23, 2010. The tissue samples collected during this biopsy were analyzed by Dr. Billy Ballard, a pathologist, who diagnosed

---

statement regarding his purpose is arguably "self-serving" does not completely vitiate the value of that statement, particularly when no evidence of a contrary purpose exists. *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 300 (6th Cir. 2008) (noting that a statement which is "arguably self-serving[] is not 'no evidence'").

Mr. Mize with grade 4, stage IV compensated cirrhosis.[9]  On January 11, 2011, Dr. Sator met with Mr. Mize to discuss the pathology report, informing Mr. Mize of Dr. Ballard's diagnosis and that, due to the grade and stage of Mr. Mize's condition, he could not prescribe interferon/ribavirin treatment.  Dr. Sator instead formulated a treatment plan for Mr. Mize that focused on preventative care, including the prevention of infections and further liver damage, monitoring of Mr. Mize's nutrition, and periodic testing.  The treatment plan also included steps to monitor Mr. Mize for progression of his condition into liver cancer.

On January 25, 2011, Mr. Mize filed a "TDOC Inmate Inquiry – Information Request" regarding "procedures and information on chronic disease management (hepatitis C and grade 4 cirrhosis)."  (Docket No. 341 (Ex. 15), p. 91.)  Dr. Sator responded to this request on February 2, 2011, stating: "The recent recommendation from the Federal Bureau of Prison guidelines for the treatment of Hep C are: Stage I – no treatment, Stage 2 & 3 – consider treatment; Stage 4 – no treatment."  (*Id.*)  Dr. Stator further responded that this approach was "confirmed" to him on January 17, 2011 during a "providers' meeting."  (*Id.*)  On March 13, 2011, Mr. Mize filed another request for information, requesting that he be referred to a specialist and complaining of pain in his liver.  (Docket No. 341 (Ex. 16), p. 93.)  Dr. Sator responded on March 21, 2011, stating that "[t]he next step after the liver biopsy would have been to see the infectious disease specialist," but that, "with the grade 4, stage IV cirrhosis report on the biopsy," Mr. Mize would not be referred to a specialist, because "this stage is not recommended for treatment."  (*Id.*)  According to Dr. Sator, "[a]ll [the specialist] will do is talk to you about the same things we have already discussed."  (*Id.*)

---

[9] Cirrhosis is generally divided into two stages, compensated and decompensated, with compensated being the less severe of the two.  The parties agree that there is no evidence suggesting that Mr. Mize was diagnosed with decompensated cirrhosis.  (Docket No. 356 ¶ 70.)

After he was diagnosed with cirrhosis, Mr. Mize repeatedly presented at Riverbend's sick call complaining of pain in his liver and requesting that he be referred to a specialist. There is no evidence in the record that, after the diagnosis, Dr. Sator prescribed any treatment for Mr. Mize's hepatitis C – other than ibuprofen to treat Mr. Mize's complaints of pain – or referred Mr. Mize to the infectious disease specialist, as Mr. Mize had requested.

## II.     Federal Bureau of Prisons Guidelines

Central to Mr. Mize's claims are the FBOP Guidelines relating to the prevention and treatment of hepatitis C and cirrhosis, which are periodically updated by the FBOP and are meant to "provide[] recommendations for the medical management of . . . inmates with hepatitis C, or who are otherwise at risk of infection." (Docket No. 339-4 (2009 FBOP Guidelines), p. 1.) Doctors practicing within Tennessee prisons, such as Riverbend, generally follow FBOP Guidelines, and Dr. Sator has conceded that he was aware of the contents of updated versions of the FBOP Guidelines when they were published in 2005 and 2009. (Docket No. 356 ¶ 10.)

With respect to the prescription of interferon/ribavirin treatment, both the 2005 and 2009 versions of the Guidelines recommend such treatment for inmates infected with hepatitis C, so long as they exhibit no contraindications to the therapy. (Docket No. 339-3 (2005 FBOP Guidelines), p. 27; Docket No. 339-4, p. 10.) The 2005 FBOP Guidelines instruct treating physicians to weigh various factors in determining whether to prescribe interferon/ribavirin treatment, noting that "the best marker for determining who should be offered antiviral therapy" is "[t]he presence of moderate to severe fibrosis (Metavir ≥ stage 2 or Ishak ≥ stage 3) on liver biopsy." (Docket No. 339-3, pp. 26–27.) The 2005 FBOP Guidelines further recommend, in a "Step-wise Approach for Evaluating and Treating Chronic Hepatitis C," that physicians "[o]ffer liver biopsy to most inmates, regardless of genotype," to determine the extent of fibrosis in the

liver, and consider antiviral therapy if the biopsy reveals portal or bridging fibrosis, moderate

inflammation, and necrosis.  (*Id.* at p. 62.)  The 2009 FBOP Guidelines instruct that antiviral

therapy is "generally indicated for inmates with chronic hepatic C" if they present with at least

one of the following conditions: (1) hepatitis C belonging to genotype 2 or 3 (with no biopsy

performed); (2) a "significant liver biopsy result," which includes any biopsy result showing that

the inmate has cirrhosis; or (3) "[e]vidence of compensated cirrhosis – with or without biopsy."

(Docket No. 339-4, p. 7.)

With respect to liver biopsies, the 2005 FBOP Guidelines state unequivocally that they

are "the best means of staging liver disease in patients with chronic hepatitis C."  (Docket

No. 339-3, p. 28.)  The guidelines instruct that a liver biopsy is "generally indicated" for all

inmates who, like Mr. Mize, have hepatitis C belonging to genotype 1.  (*Id.* at pp. 28–29.)  The

guidelines further caution that "[t]he decision to obtain a liver biopsy should not be strongly

based on ALT levels," at least in part because "even persons with normal ALT levels may have

liver disease," and "a small, but significant percentage (14–24%) of persons with normal ALT

levels have more than portal fibrosis (Metavir ≥ stage 2)."  (*Id.* at p. 28.)  The guidelines then

caution that "[t]he greater the ALT level, the more likely it is that a person has significant liver

disease; therefore, inmates with markedly elevated ALT levels should be prioritized for liver

biopsy."  (*Id.*)  Neither the 2005 nor the 2009 versions of the FBOP Guidelines recommend a

liver ultrasound for "staging" a patient's liver but, rather, recommend such a test to screen for

hepatocellular carcinoma in patients with cirrhosis or a family history of the condition.  (Docket

No. 339-3, pp. 10, 26; Docket No. 339-4, p. 18.)

III.    <u>**Dr. Martin's Expert Opinion**</u>

Dr. Martin, a medical doctor who specializes in internal medicine and who has reviewed

Mr. Mize's medical records and FBOP Guidelines, has submitted his expert opinion regarding the medical care that Mr. Mize received – or, more appropriately, did not receive – from Dr. Sator.  Dr. Martin opines that Dr. Sator's failure to order a liver biopsy or prescribe antiviral therapy to Mr. Mize from 2007 to 2009 led to Mr. Mize's untreated hepatitis C infection "developing [into] the painful and life-threatening condition of cirrhosis of the liver."  (Docket No. 339-2 (Dr. Martin Report), p. 6.)  Dr. Martin further opines that Dr. Sator's refusal to prescribe antiviral therapy to Mr. Mize after he was diagnosed with cirrhosis, and his continued adherence to "a plan of treatment that amounted to no treatment . . . at all," could have "cause[d] [Mr. Mize] harm and worsen[ed] his already sever[e] liver condition."  (*Id.* at pp. 7–9.)  Dr. Martin ultimately concludes, "to a reasonable degree of medical certainty," that Dr. Sator prevented Mr. Mize from receiving "treatment that could have prevented or mitigated his current serious medical condition," which was "more likely than not a substantial cause of Mr. Mize's cirrhosis and serious condition today."  (*Id.* at p. 9.)

Dr. Martin also concludes that Dr. Sator "should have ordered additional testing, including a liver biopsy, to evaluate the progression of Mr. Mize's [hepatitis C] and options for treatment" in May of 2007 or soon thereafter.  (*Id.* at p. 1.)  Dr. Martin bases this conclusion on the fact that Mr. Mize's medical records showed that he had a substantial risk of developing fibrosis and cirrhosis, "including that he was male and had suffered from a chronic hepatitis C infection for nearly a decade."  (*Id.*)  Furthermore, Dr. Martin states, "Mr. Mize's historical laboratory results showed the majority of his liver function tests (LFTs) were persistently elevated, specifically his levels of [ALT]," which "may be indicative of inflammation and/or fibrosis caused by hepatitis C infection."  (*Id.* at p. 2.)  In light of these results and risk factors, Dr. Martin concludes that Dr. Sator "should have, at minimum, ordered a liver biopsy to evaluate

and stage Mr. Mize's liver," and that such testing could have indicated that Mr. Mize should receive interferon/ribavirin treatment – "a common and generally-recommended treatment" – that could prevent a patient with a chronic hepatitis C infection, such as Mr. Mize, from developing cirrhosis.  (*Id.*)

Dr. Martin further opines that an ultrasound test, which Dr. Sator ordered for Mr. Mize in September of 2008, was "basically useless to staging fibrosis of the liver or determining whether interferon/ribavirin therapy should be prescribed" because, at the time, "ultrasounds were not effective or useful in assessing hepatic fibrosis or early cirrhosis."  (*Id.* at p. 5.)  According to Dr. Martin, an ultrasound test would have been less expensive than a liver biopsy in 2008, but a liver biopsy would have been "the only reasonably efficacious means of staging liver disease" in a patient who, like Mr. Mize, had chronic hepatitis C.  (*Id.* at pp. 5–6.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

As a preliminary matter, the court addresses the defendants' argument that Mr. Mize's claims are wholly, or in part, barred by the one-year statute of limitations applicable to § 1983 claims. (Docket No. 250, pp. 6–8); *see also Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005) (stating that § 28–3–104(a) of the Tennessee Code provides a one-year limitations period for claims brought pursuant to § 1983). According to the defendants, because Mr. Mize did not file a claim until July of 2011, all of his claims that are based on medical care he received before July of 2010 – including his entire claim against Corizon – are untimely and, therefore, barred. (Docket No. 250, pp. 6–8.) Mr. Mize, on the other hand, argues that the discovery rule, whereby the statute of limitations does not begin to run until the plaintiff "knows or has reason to know of the injury which is the basis of his action," *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984), provides that the statute of limitations did not begin to run on his claims until he was diagnosed with cirrhosis in January of 2011 (Docket No. 337, pp. 14–16), a mere nine months before he filed the Complaint. The defendants did not reply to Mr. Mize's argument, despite having been given two opportunities, and they have not provided the court with an alternative theory for when Mr. Mize should have been alerted to the damage to his liver, such that the statute of limitations on his claims would begin to run. Based on the facts and arguments before it, therefore, the

court cannot conclude that Mr. Mize's claims are time-barred, and it will not grant summary judgment to the defendants on that ground.

To survive summary judgment on his § 1983 claims, Mr. Mize must demonstrate that genuine disputes of material fact support the inference that he was deprived of rights secured by the Constitution and laws of the United States by a person acting under color of state law. *Tahfs v. Proctor*, 316 F. 3d 584, 590 (6th Cir. 2003) (citations omitted); 42 U.S.C. § 1983. Mr. Mize alleges that the defendants deprived him of his rights under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. An inmate's constitutional right to be free from such punishment is violated when a person – usually a health care provider – acts with "deliberate indifference" to the inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

An Eighth Amendment deliberate indifference inquiry is comprised of two components: (1) an objective component that requires the plaintiff to demonstrate that he had a medical condition that was "sufficiently serious," *Brown v. Chapman*, 814 F.3d 447, 465 (6th Cir. 2016); and (2) a subjective component that requires the plaintiff to prove "facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk," *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). It is also important for the court to note that the Supreme Court has defined "deliberate indifference" as being more than mere negligence but less than acting with purpose or knowledge; proof that a medical professional acted with a state of mind similar to recklessness is sufficient to support a finding of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835–36 (1994); *see also Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993) ("[A] determination of deliberate indifference does not require

proof of intent to harm.").

The defendants have not disputed that, as health care providers at a Tennessee state prison, they acted under color of state law for purposes of § 1983. They also do not dispute that Mr. Mize's chronic hepatitis C infection – and, later, his cirrhosis – are serious medical conditions that satisfy the objective component of the deliberate indifference inquiry. The central issue before the court, therefore, is whether Mr. Mize has presented sufficient evidence to support a reasonable inference that, in delaying or denying treatment to him, the defendants subjectively inferred a substantial risk to Mr. Mize's health that they then disregarded.

## I.   The Claim Against Dr. Sator

Mr. Mize has presented evidence sufficient to allow a reasonable jury to find that, by refusing to prescribe antiviral therapy to Mr. Mize or to undertake the steps necessary to determine the advisability of such treatment, Dr. Sator was deliberately indifferent to Mr. Mize's serious medical needs. The undisputed facts reasonably support the inference that Dr. Sator perceived facts from which he could infer a substantial risk to Mr. Mize's health and that he did draw that inference. First, Dr. Sator has admitted that, when he first began treating Mr. Mize and at all times during the period in which Mr. Mize was under his care, he was aware that Mr. Mize had been living with a chronic hepatitis C infection for almost a decade. Dr. Sator has further acknowledged that, based on this factor alone, Mr. Mize faced "a substantial, ongoing risk for developing fibrosis and cirrhosis of the liver, as well as other serious and potentially fatal liver ailments." (Docket No. 356 ¶ 21.) Furthermore, Mr. Mize has introduced evidence of other factors – contained in Mr. Mize's medical records and thereby known to Dr. Sator – that demonstrated that Mr. Mize was at risk of developing fibrosis or cirrhosis of the liver, including that he was male and that his test results demonstrated a history of elevated ALT levels

stretching back to 1998. Based on Dr. Sator's admissions alone, therefore, Mr. Mize has provided sufficient evidence to support the reasonable inference that Dr. Sator perceived facts from which he could infer that Mr. Mize faced a substantial risk of developing or worsening liver damage, and that he did draw that inference.

The undisputed facts further support the inference that Dr. Sator recklessly disregarded the known risk that Mr. Mize's untreated hepatitis C posed to his health, and particularly to his liver, when he failed to order a liver biopsy or prescribe interferon/ribavirin treatment while Mr. Mize was under his care from 2007 to 2009. Dr. Sator has admitted that interferon/ribavirin treatment can cure a hepatitis C infection and, in so doing, prevent a patient from developing or worsening liver damage, including cirrhosis. Dr. Sator has further acknowledged that, before he could have determined whether interferon/ribavirin treatment should be prescribed to Mr. Mize, he would have had to conduct a liver biopsy to "stage" Mr. Mize's liver and determine the degree of fibrosis or cirrhosis present. Regardless of the fact that Mr. Mize could not receive this potentially life-saving treatment unless and until Dr. Sator conducted a biopsy of his liver, Dr. Sator did not have Mr. Mize's liver biopsied at any point in the two years during which Mr. Mize was initially under his care.

Moreover, in failing to order a liver biopsy, Dr. Sator disregarded the 2005 FBOP Guidelines for the treatment of patients like Mr. Mize, guidelines that doctors practicing in Tennessee prisons generally follow and that Dr. Sator has admitted knowing. These guidelines instruct that a liver biopsy is "generally indicated" for all inmates who, like Mr. Mize, have hepatitis C belonging to genotype 1. (Docket No. 339-3 (2005 FBOP Guidelines), p. 29.) These guidelines also caution that the decision to order a liver biopsy should not be based on an inmate's historic or current ALT levels, at least in part because up to 24% of persons infected

with hepatitis C and with *normal* ALT levels have fibrosis or cirrhosis of the liver significant enough to warrant interferon/ribavirin treatment. (*Id.* at pp. 28–29.) Nevertheless, Dr. Sator chose to base any decision to order a liver biopsy solely on Mr. Mize's ALT levels, noting that he would order a biopsy if Mr. Mize's average ALT level exceeded two times the high end of the normal range for that enzyme, or two successive laboratory tests showed ALT levels exceeding two times the upper limit of that range. Based on Dr. Sator's own admissions and his direct contravention of relevant clinical guidelines, therefore, a reasonable jury could conclude that he recklessly disregarded a known risk to Mr. Mize's health when he failed to order a liver biopsy or prescribe antiviral therapy to Mr. Mize at any point between 2007 and 2009.

There also exists sufficient evidence to support the inference that Dr. Sator disregarded a known risk to Mr. Mize's health when he failed to prescribe anything to treat Mr. Mize's hepatitis C, including interferon/ribavirin treatment, after Mr. Mize was returned to his care in 2010. Again, Dr. Sator has admitted that interferon/ribavirin treatment can cure hepatitis C and, in curing that infection, prevent the development or worsening of damage to a patient's liver. Dr. Sator did not, however, prescribe antiviral therapy to Mr. Mize after he had been diagnosed with compensated cirrhosis and, in so doing, disregarded the 2009 FBOP Guidelines regarding the prescription of such therapy to patients like Mr. Mize. The 2009 FBOP Guidelines – which, again, Dr. Sator has admitted he knew – instruct that antiviral therapy should be given to inmates with chronic hepatitis C who, like Mr. Mize, have had a "significant liver biopsy result" or have been diagnosed with compensated cirrhosis. (Docket No. 339-4 (2009 FBOP Guidelines), p. 7.) Moreover, as reflected in the Corizon Form that Dr. Sator completed in November of 2010, Mr. Mize exhibited only two contraindications for interferon/ribavirin treatment, and neither of the marked contraindications was classified as "potentially severe." (Docket No. 341 (Ex. 11),

pp. 76–77.) Mr. Mize is further entitled to the reasonable inference – based on his having given

his signed, informed consent to interferon/ribavirin treatment in November of 2010 – that

Dr. Sator recognized the advisability of that treatment, intended to prescribe it to Mr. Mize, and

then disregarded his own recommended course of action. A reasonable jury could, therefore,

conclude that Dr. Sator recklessly disregarded a known risk to Mr. Mize's health when he failed

to prescribe interferon/ribavirin treatment to Mr. Mize after Mr. Mize was returned to his care in

2010.

Finally, Mr. Mize has produced sufficient evidence, in the form of Dr. Martin's expert

opinion, to support the reasonable inference that Dr. Sator's deliberately indifferent conduct

caused the damage to his liver. Dr. Martin, an experienced physician specializing in internal

medicine, reviewed Mr. Mize's medical records and has concluded "to a reasonable degree of

medical certainty" that Dr. Sator prevented Mr. Mize from receiving "treatment that could have

prevented or mitigated his current serious medical condition," which was "more likely than not a

substantial cause of Mr. Mize's cirrhosis and serious condition." (Docket No. 339-2 (Dr. Martin

Report), p. 9.) The defendants argue that Dr. Martin's expert opinion is insufficient to establish

causation, citing an unpublished opinion from the Southern District of Ohio for the proposition

that a § 1983 plaintiff must "present verifiable medical evidence of harm resulting from the lack

of or delay in medical treatment for his . . . conditions." (Docket No. 352, p. 7 (quoting *Price v.*

*Jones*, No. 1:12-cv-360, 2013 WL 2424141, at *3 (S.D. Ohio June 4, 2013)). The court is not

aware, however, of any precedent – including the case cited by the defendants – that stands for

the proposition that the opinion of an expert, *based* on verifiable medical records, is insufficient

to create a genuine dispute of fact regarding the cause of the plaintiff's injury, such that the court

must grant summary judgment on the plaintiff's claims. Mr. Mize has, therefore, produced

evidence sufficient to create a genuine dispute of fact as to Dr. Sator's role in causing the damage that he has suffered to his liver.

Dr. Sator's primary argument in favor of summary judgment is that Mr. Mize's assertions amount to, at most, disagreements with Dr. Sator's medical judgment, which are not sufficient to establish a constitutional violation.  (*See* Docket No. 352, p. 3.)   It is true that, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).  This is not, however, a case in which Mr. Mize disagrees with the treatment that he received and, therefore, seeks compensation and alternative treatment. Mr. Mize contends that he was denied treatment that was necessary to prevent his condition from worsening, both through Dr. Sator's delay in ordering a liver biopsy and his continuing refusal to prescribe antiviral therapy to treat Mr. Mize's hepatitis C.

Furthermore, Dr. Sator cannot insulate himself from liability simply by arguing that he provided "some" treatment to Mr. Mize, including the ineffective and less expensive ultrasound that he ordered for Mr. Mize's liver in September of 2008 and the preventative care that he ordered in lieu of antiviral therapy after Mr. Mize was diagnosed with cirrhosis in 2010.  As the Sixth Circuit has noted, "deliberate indifference may be established in cases where it can be shown that a defendant rendered 'grossly inadequate care' or made a 'decision to take an easier but less efficacious course of treatment.'"  *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  Mr. Mize has presented evidence from which a reasonable jury could infer that

Dr. Sator's delay in ordering a liver biopsy and refusal to prescribe interferon/ribavirin treatment constitute grossly inadequate care and that Dr. Sator's ordering of an ultrasound and plan to treat Mr. Mize's hepatitis C and cirrhosis solely with preventative care constitute easier, but less efficacious, courses of treatment. Mr. Mize, therefore, has presented evidence sufficient to allow a reasonable jury to find that, by refusing to prescribe antiviral therapy to Mr. Mize or to undertake the steps necessary to determine the advisability of such treatment, Dr. Sator was deliberately indifferent to his serious medical needs. Accordingly, the defendants' request for summary judgment on Mr. Mize's § 1983 claim against Dr. Sator will be denied.

## II.   The Claim Against Corizon

Mr. Mize's claim against Corizon is based on his allegation that the company does not follow, or does not have, a policy that ensures that updates to the FBOP Guidelines are incorporated into its guidance to physicians at prisons in Tennessee. (Docket No. 165 ¶¶ 10–23.) As evidence of this failure, Mr. Mize has submitted evidence demonstrating that (1) Dr. Sator used an outdated Corizon form in November of 2010, apparently while Dr. Sator was attempting to determine whether to prescribe antiviral therapy to Mr. Mize; and (2) Dr. Sator was, by his own admission, told at a "providers' meeting" in 2011 that antiviral therapy is not available to treat inmates who, like Mr. Mize, have stage IV cirrhosis. (*See* Docket No. 361, pp. 7–8.)

After reviewing the parties' filings regarding the pending motion, however, the court finds that the record contains little to no other information regarding Corizon's role in Dr. Sator's treatment of Mr. Mize from 2007 to 2011, and the court, therefore, lacks sufficient factual information to rule on the motion with respect to the claim against Corizon. In light of the fact that Mr. Mize apparently struggled to develop the factual record as a *pro se*, incarcerated litigant, and because he was not appointed counsel until *after* discovery had closed, the court finds it

appropriate to re-open discovery to allow the parties the opportunity to develop the record with respect to Mr. Mize's claims against Corizon. Accordingly, the court will deny the defendants' request for summary judgment with respect to that claim, with the understanding that this denial is without prejudice to any request the defendants may make in the future, after the parties have had the opportunity to further develop the factual record, for summary judgment on Mr. Mize's § 1983 claim against Corizon.

## CONCLUSION

For the reasons discussed herein, the defendants' Objection to the Plaintiff's Statement of Facts will be overruled, the Objection to the Plaintiff's Expert Witness will be overruled in part and sustained in part, and the Motion for Summary Judgment will be denied. The court will re-open discovery to allow the parties further opportunity to develop the factual record regarding (1) the role played by Corizon in the delay or denial of medical care to Mr. Mize, and (2) the expert opinion submitted by Mr. Mize in opposition to the defendants' motion.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge